1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY C. OLIVER,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>RONALD DAVIS, Warden of<br>California State Prison at San Quentin,<br><br>　　　　　Respondent. | CASE NO. CV 10-8404 -ODW<br><br>**<u>DEATH PENALTY CASE</u>**<br><br>ORDER GRANTING IN PART AND<br>DENYING IN PART PETITION FOR<br>WRIT OF HABEAS CORPUS |

　　　　Petitioner Anthony C. Oliver was convicted of the first degree murders of Patrinella Luke and Eddie Mae Lee and the attempted murder of Peter Luke.  The jury found true a multiple murder special circumstance allegation and returned a verdict of death.  *People v. Lewis*, 39 Cal. 4th 970, 978 (2006).

　　　　The California Supreme Court affirmed the judgment on August 24, 2006. *Id.*  Petitioner filed a petition for writ of habeas corpus in the California Supreme Court on February 9, 2004.  (Lodg. C-10, Docket No. 36.)  The court denied it on August 18, 2010.  (Lodg. C-13, Docket No. 36.)  Petitioner filed the instant Petition for Writ of Habeas Corpus on August 17, 2011.  (Docket No. 51.)

**I.     Review under 28 U.S.C. § 2254(d)**

Section 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court held in *Cullen v. Pinholster* that when determining whether a petitioner has satisfied § 2254(d), a court may only consider evidence in the state court record.  563 U.S. 170, 181, 185 n.7 (2011).  The Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 181.  Section 2254(d)(2) "includes the language 'in light of the evidence presented in the State court proceeding,' . . . [providing] additional clarity . . . on this point." *Id.* at 185 n.7.

The Supreme Court explained in *Lockyer v. Andrade* that a state court decision is "contrary to our clearly established precedent" under § 2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in our cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from our precedent."  538 U.S. 63, 73 (2003) (internal quotations omitted).  "[U]nder the 'unreasonable application' clause" of § 2254(d)(1), "a federal habeas court may grant the writ if the state court identifies the correct

governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (internal quotation omitted). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (internal citation omitted).

"[A]s to the clause dealing with 'an unreasonable determination of the facts,'" § 2254(d)(2), "the statement of facts from the last reasoned state court decision is afforded a presumption of correctness that may be rebutted only by clear and convincing evidence." *Cudjo v. Ayers*, 698 F.3d 752, 762 (9th Cir. 2012) (discussing § 2254(d) and § 2254(e)(1)) (internal quotation omitted). Under § 2254(d)(2), "if a petitioner challenges the substance of the state court's findings," the court:

> must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record. Similarly, when the challenge is to the state court's procedure, mere doubt as to the adequacy of the state court's findings of fact is insufficient; we must be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.

*Hibbler v. Benedetti*, 693 F.3d 1140, 1146-47 (9th Cir. 2012) (internal quotations omitted; alteration in original).

The United States Supreme Court made clear in *Harrington v. Richter* that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." 562 U.S. 86, 101 (2011) (internal quotation omitted). Section 2254(d) provides "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (internal quotations omitted).

## II.   Claim 1: *Batson* Violation

### A.   Legal Standard

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).  The Supreme Court has articulated a three-part test to govern the analysis of *Batson* claims:

> First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.  Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes.  Third, if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination.

*Johnson v. California*, 545 U.S. 162, 168 (2005) (internal quotation marks, alterations, citations, and footnote omitted).  "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam).

"Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion).  In Petitioner's case, the California Supreme Court on direct appeal "assume[d] solely for purposes of argument that, for each prospective juror, [it] must proceed to the third step of the *Batson-Wheeler* inquiry, i.e., whether substantial evidence supported the trial court's finding that the prosecution had articulated a permissible, race-neutral reason for the excusal." *Lewis*, 39 Cal. 4th at 1010.

At the third step of the *Batson* inquiry, "the persuasiveness of the [prosecution's] justification becomes relevant – the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett*, 514 U.S. at 768 (emphasis omitted). The court must determine whether the strike was "'motivated in substantial part by discriminatory intent.'" *Foster v. Chatman*, 136 S. Ct. 1737, 1754 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 485 (2008)); *see also id.* at 1754 n.6 ("In *Snyder*, we noted that we had not previously allowed the prosecution to show that 'a discriminatory intent [that] was a substantial or motivating factor' behind a strike was nevertheless not 'determinative' to the prosecution's decision to exercise the strike. The State does not raise such an argument here and so, as in *Snyder*, we need not decide the availability of such a defense." (quoting *Snyder*, 552 U.S. at 485)). The court must decide "not only whether the reasons stated are race-neutral, but whether they are relevant to the case, and whether those stated reasons were the prosecutor's genuine reasons for exercising a peremptory strike, rather than pretexts invented to hide purposeful discrimination." *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008). As the Supreme Court explained in *Snyder*, "[t]he prosecution's proffer of [one] pretextual explanation naturally gives rise to an inference of discriminatory intent[,]" even where other, potentially valid explanations are offered. 552 U.S. at 485.

In undertaking its "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Batson*, 476 U.S. at 93 (internal quotation omitted), the court may conduct "side-by-side comparisons" of prospective jurors in the protected group who were struck and prospective jurors outside the group who were allowed to serve.[1] *See Miller-El v. Dretke*, 545 U.S. 231, 241 (2005)

---

[1] The Ninth Circuit has concluded that the Supreme Court's use of comparative juror analysis in *Miller-El* was merely a clarification of *Batson*'s three-step

(finding that side-by-side comparisons of Black venire members who were struck and non-Black venire members allowed to serve were "[m]ore powerful" than bare statistics).  "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."  *Id.*  The California Supreme Court on Petitioner's direct appeal "assume[d], without deciding, that comparative juror analysis must be undertaken for the first time on appeal in the present case . . . ."  *Lewis*, 39 Cal. 4th at 1017.

A court's decision at *Batson*'s third step is a factual finding.  *Miller-El*, 545 U.S. at 240 (reviewing the "trial court's prior determination of fact that the State's race-neutral explanations were true"); *accord Foster*, 136 S. Ct. at 1747 (finding *Batson* violation on review from denial of state habeas relief); *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2202 (2015).  "[T]hese determinations of credibility and demeanor lie peculiarly within a trial judge's province, and in the absence of exceptional circumstances, we will defer to the trial court."  *Ayala*, 135 S. Ct. at 2201 (internal quotations and alteration omitted).  The Supreme Court emphasized in *Ayala* that "[t]he role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply *de novo* review of factual findings and to substitute its own opinions for the determination made on the scene by the trial judge."  *Id.* at 2202 (internal quotations omitted).

---

framework.  *See Boyd v. Newland*, 467 F.3d 1139, 1146 (9th Cir. 2006) ("[I]f the Supreme Court's endorsement of comparative juror analysis on appeal constituted a new procedural rule, the Court would not have applied that rule to Miller-El, whose case came before the Court on an appeal from a denial of habeas corpus. Because the Court did engage in extensive comparative juror analysis, we can infer that *Miller-El* [] must only have clarified the extant *Batson* three-step framework." (internal citation omitted)).

To be entitled to federal habeas relief, a petitioner must show that the state court's decision at step three was based on an unreasonable determination of the facts under § 2254(d)(2) and must rebut by clear and convincing evidence the presumption of correctness of its findings under § 2254(e)(1). *Ayala*, 135 S. Ct. at 2199-2200; *Miller-El*, 545 U.S. at 240; *compare Currie v. McDowell*, 825 F.3d 603, 610 n.4 (9th Cir. 2016) ("The Supreme Court has declined to decide whether § 2254(d)(2) applies when considering a third-stage *Batson* claim under AEDPA, or whether § 2254(e)(1)'s 'clear and convincing evidence' standard applies.  This Court has previously decided to apply 2254(d)(2) where, as here, the relevant evidence is entirely in the record." (internal citations omitted)), *with Crittenden v. Chappell*, 804 F.3d 998, 1011 (9th Cir. 2015) ("In reviewing the merits of a habeas petitioner's claim after § 2254(d) is satisfied, we still defer to a state court's factual findings under § 2254(e)"); *see also id.* at 1010 ("[Crittenden's] clear and convincing evidence included that the crime was racial in nature, [the struck prospective juror] was the only African-American juror in the venire and the only juror subject to a meritless for-cause challenge, and there was a disparity between the prosecutor's rating of [the African-American prospective juror] and his ratings of comparable white jurors.").

## B.  Factual Background

As the California Supreme Court explained on direct appeal:

The King beating case lies in the background of the proceedings.  On May 4, 1992, the trial court granted Oliver's mistrial motion following the verdicts of acquittal of police officers in that case, which involved the beating of Rodney King, a Black man, and the subsequent 'civil unrest in Los Angeles since April 29, 1992,' which included a well-publicized assault on Reginald Denny, a White man, by rioters.  On May 7, the court granted [codefendant Albert] Lewis's mistrial motion on the same grounds, and dismissed the original jury venire as to both defendants.  Because the King beating case had so recently ended when the new venire was summoned, some prospective jurors mentioned the case in answer to the questions, 'What serious criminal

case have you followed in the media within the last five years?' and
'Do you feel justice was served[?]'

*Lewis*, 39 Cal. 4th at 1016-17.

During jury selection, defense counsel brought four motions under *People v. Wheeler*, 22 Cal. 3d 258 (1978), challenging the prosecutor's exercise of peremptory challenges against seven Black men.  *Cf. Crittenden*, 804 F.3d at 1004 (*Wheeler* is "the California procedural equivalent of *Batson*, and serves as an implicit *Batson* objection" for purposes of preserving a *Batson* claim when raised in state court); *Lewis*, 39 Cal. 4th at 1008 n.9 ("[T]he *Wheeler* objection preserves the *Batson* claims.").  The trial court found no prima facie case of discrimination on the first motion but directed the prosecutor to explain her reasons for the challenges.  (13 RT 1977-78.)

The first *Wheeler* motion included prospective juror L.W.  L.W. wrote on his questionnaire that he had a half-brother who had been the victim of a crime and who was in prison.  (2 CT Supp. 565-66.)  The questionnaire asked what his feelings were on the response of law enforcement after his half-brother was a crime victim, and L.W. wrote, "I feel positive about it."  (2 CT Supp. 566.)  He wrote of his feelings on the response of the judicial system to that incident, "We need it."  (*Id.*)

When asked on his questionnaire if he, a close friend, or a relative had ever had an unpleasant experience with a peace officer, L.W. wrote that he got a moving violation that wasn't his fault.  (3 CT Supp. 575.)  On voir dire, the court asked him:

How did you handle it?  What did you do about it?

Prospective Juror [L.W.]:  Well, I had – I just went to traffic school.

The Court:  You didn't contest it or –

Prospective Juror [L.W.]:  No.

The Court:  – try to explain it to the judge?

Prospective Juror [L.W.]:  I didn't want to take the time.

The Court:  Was it a situation where the officer made a judgment call that was wrong or was he flat out – did he see something that didn't happen or what?  [¶]  Did you think he was professional?  Let me just ask you that.

Prospective Juror [L.W.]:  Well, what happened was, I had ran a light they said, okay.  I was in my van just driving going to pick my daughter up, and I didn't run a red light.  But these guys followed me looked like from about six blocks.

The Court:  Before they stopped you?

Prospective Juror [L.W.]:  Then they pulled me over and they checked my license out and everything.  So I think that they thought it might have been a stolen vehicle.  So they had to tell me some reason why they stopped me.

The Court:  And that was running the red light?

Prospective Juror [L.W.]:  That was running the light.

The Court:  Anything about that experience that perhaps sours you on all police officers?  If an officer were to testify here, would you tend to disbelieve him a little bit because of what happened to you?

Prospective Juror [L.W.]:  No.

(13 RT 1833-34.)  The prosecutor asked L.W.:

[W]hen did that traffic incident occur?

Prospective Juror [L.W.]:  About four years ago.

Ms. Clark [the prosecutor]:  . . . [T]his question . . . , 'Would you be able to apply the same standards to judge the credibility of all witnesses called in the case?'  [¶]  In other words, you wouldn't use one standard for the police and another standard for the civilian witnesses and another standard for the fireman and another – you know what I mean?

Prospective Juror [L.W.]:  No, I won't.

-9-

Ms. Clark:  They all start out the same?

Prospective Juror [L.W.]:  Yes.

Ms. Clark:  And even though that one experience you had with the police wasn't too cool, maybe all police are different?

Prospective Juror [L.W.]:  That's right.

Ms. Clark:  Some are okay?  [¶]  Do you think you could give all witnesses a fair break in terms of evaluating their credibility and decide on your own based on what you see and hear and all the evidence that you hear whether or not they're telling the truth?

Prospective Juror [L.W.]:  Yes.

(13 RT 1836-37.)

When asked to explain her reasons for the peremptory strike, the prosecutor said of L.W.:

> [T]his was the one that gave me a bad feeling about him right from the start, especially when he indicated he was about stopped [sic] for running a red light, felt that the police simply used an excuse to stop him because they actually thought he was driving a hot car.  And *it was definitely my feeling that he thought he was being discriminated against because he was Black.*
>
> I did not believe him when he said that he would not hold that against us.  Everything about his demeanor in response to my questioning and his demeanor in response to me in general was very negative.  I didn't feel like there was any hope the People had of getting a fair trial from this particular juror given the statements he made about his own experience with the police and his background with his brother in addition of course to the fact that I thought he had intellectual difficulty following what was going on.
>
> He himself never had a pleasant experience with a police officer to balance out that bad experience that he referred to for himself and he did seem to hold that grudge very firmly.  It happened four years ago and he seemed to remember it like it was yesterday.  So it's not

something that he's dismissed.  It's something that could have happened last week.

 (13 RT 1979 (emphasis added).)  Juror L.W. did not say that he believed the police stopped him because of his race.  *See generally Hernandez v. New York*, 500 U.S. 352, 361 (1991) (holding prosecutor offered race-neutral grounds for peremptory strikes where challenges did not rest on "stereotypical assumptions" about the group at issue); *Kesser v. Cambra*, 465 F.3d 351, 357 (9th Cir. 2006) (en banc) (holding the "racial animus behind the prosecutor's strikes [was] clear" in part because the prosecutor "worried that Native Americans who worked for the tribe . . . are sometimes resistive of the criminal justice system generally and somewhat suspicious of the system" (internal quotation omitted)).  The trial court denied the motion.  (13 RT 1980, 1982 ("The only question is, is Ms. Clark properly exercising a peremptory.  And I don't think it is improperly exercised. . . . [The *Wheeler* motion is] denied.  I find there's no prima facie case.  I'm just making a record.  It's denied.").)

The trial court found a prima face case of discrimination on the defense's second motion, which included prospective juror L.B.  (14 RT 2122-23.)  On voir dire, juror L.B. explained that his brother was arrested for robbery and was being held pending trial even though the prosecution "d[id]n't have enough evidence." (14 RT 2058.)  He said of the arrest:

> They say it was robbery and so they told my mother if they could arrest him on the street or shoot him, so she took him down.
>
> The Court:  That is what they told your mother?
>
> Prospective Juror [L.B.]:  So she took him down to the police station and they said they wanted to talk to him.  And when he went down there they arrested him and he has been there ever since. . . .
>
> The Court:  What had he been in state prison for before?
>
> Prospective Juror [L.B.]:  I think it was for drugs.

-11-

The Court:  And just in terms of having an impact on your attitude towards law enforcement, you indicate later on in the questionnaire that you have had good and bad experiences with police officers, one where you say you weren't treated with respect.  [¶]  In light of what your mother was told and what has happened to your brother, how do you feel about LAPD?

Prospective Juror [L.B.]:  You have some good ones, you ever [sic] some bad ones.

The Court:  With respect to your feelings or what happened to your mother and your brother, was anything done, did anybody try to complain or file a complaint against the officer:

Prospective Juror [L.B.]:  That is what they have done. . . .

The Court:  Basically the system is just not working, is it?

Prospective Juror [L.B.]:  It works but it's not working for him. . . .

(14 RT 2059-61.)

When asked to explain her reasons for exercising a peremptory strike against L.B., the prosecutor stated:

Given the experiences that he described with his brother, I felt that as nice a man as [L.B.] was, *I could not imagine him possibly being fair in any way in which a defendant who was Black was being tried for a crime.*  The experience that he kept repeating . . . was that the People kept coming back to court and they didn't have enough evidence, but they still kept his brother in custody. . . .  I don't think there is any prosecutor who is competent that would allow such a person to sit on a jury given the bad experience that he so recently had and is actually ongoing. . . .  It was his obvious feeling of unfairness in the system and the way in which he was treated.

(14 RT 2119-20 (emphasis added).)  Juror L.B. did not say that he believed his brother's treatment was related to his race.  *See generally Batson*, 476 U.S. at 89 ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors . . . *on the assumption that black jurors as a group will be unable impartially to*

-12-

1  *consider the State's case against a black defendant*." (emphasis added));

2  *Cummings v. Martel*, 796 F.3d 1135, 1147 (9th Cir. 2015) (holding strike was not

3  "'based on' race or stereotyping" because prosecutor did not "*assume*[] a black

4  juror will be partial to a black defendant" (emphasis in original)); *Kesser*, 465 F.3d

5  at 357.  The trial court denied the motion.  (14 RT 2122.)

6    The trial court initially granted the third motion, concerning prospective

7  juror V.H.  (14 RT 2203-05.)  On voir dire, the prosecutor asked V.H.:

8    Sir, did you have some prior jury experience?

9    Prospective Juror [V.H.]:  Yes.  About a year ago.

10    Ms. Clark:  A year ago.  What kind of case was that?

11    Prospective Juror [V.H.]:  It was a rape case. . . .

12    Ms. Clark:  Did you reach a verdict?

13    Prospective Juror [V.H.]:  Yes.  Not guilty. . . .

14    Ms. Clark:  And did that case turn on the credibility of the victim?

15    Prospective Juror [V.H.]:  Yes.

16    Ms. Clark:  You didn't believe her?  That was basically it because it
  was her testimony that was the case?

17    Prospective Juror [V.H.]:  Right.  Correct.

18

19    Ms. Clark:  Do you have any problem with the single witness rule?
  That is that a single witness' testimony if believed is sufficient to
  prove any facts?

20

21

22

23    Prospectie Juror [V.H.]:  I have no problem with that.

24    Ms. Clark:  Is that the only experience you had with jury duty
  previously?

25

26    Prospective Juror [V.H.]:  Yes.

27

28  (14 RT 2195-97.)

After the prosecutor excused V.H., the defense raised a *Wheeler* objection. (14 RT 2200-01.)  The trial court found a prima facie case and told the prosecutor, "I want you to explain this one."  (14 RT 2201.)  The prosecutor responded:

> This juror indicated he acquitted on a rape case in Torrance one year ago, it was his only experience with jury service, that he found the victim not to be believable.  Up until that point, I found the juror very acceptable.  [¶]  Unfortunately, it is my feeling that once a juror has had the experience of acquitting a defendant, it does create a certain mind set and the readiness to acquit.  It certainly shows that he was able to reject the prosecutor's argument, reject the people's proof and reject the word of a woman.  [¶]  In this trial, we will have women testifying to the history of abuse by one of the defendants.  Their believeability and credibility will become crucial with this case.  They are key witnesses in this case as the defense is very well-aware.  I cannot in good conscience leave a juror on who has found a woman in a situation of a criminal trial who is a key witness to be uncredible and therefore acquit. . . .  I think that it would be incompetent of me to leave a juror on who had found a woman to be uncredible and agreed to acquit them under those circumstances.

(14 RT 2201-03.)  Defense counsel argued that the prosecutor's actions were "based on race, and the totality of the circumstances that have transpired in this case call for and scream for a mistrial . . . ."  (14 RT 2203.)  The court ruled at that time:

> Mistrial is granted.  [¶]  You may feel the way you do about the fact that he acquitted in a rape case.  However, in the rape case, there were 11 other people.  It's simply because you disagree with the verdict, nothing else behind it.  I feel compelled to grant it.  I don't see how this could possibly stand up on appeal if I rejected the motion.  It would not stand up on appeal. . . .  I know you disagree with me.  I just don't think – if I don't grant the motion at this point, with the motions that we have had and in light of this case's history, with everything else – . . . [i]f we get second-guessed on this, I think we lose.  I'm not going to risk it.  I'm granting the motion. . . .  We'll . . .

start over . . . .   That's what we do on a *Wheeler* motion.   I don't see
that I have any other choice.

(14 RT 2203-05.)

The prosecutor asked for an opportunity to present authorities on the issue
and reasserted that "[n]one of these peremptory challenges were racially
motivated."  (14 RT 2207.)  The judge clarified, "I'm only talking about one juror,
and I don't think it's a mistake.  It's no mistake.  I don't want to go through two
months of trial and have it come back.  I'd rather lose one week than two months."
(*Id.*)  The prosecutor again asked to present the court with cases and restated that
she "liked [this juror] until the point he volunteered to me that he had voted to
acquit someone on a serious felony, especially where there is a woman's credibility
in issue, which is the same as my case."  (14 RT 2208-09.)  The court then said that
it would allow the prosecutor to research the issue to see "[i]f you can find
something that changes the Court's mind . . . ."  (14 RT 2209.)

The next morning, the court received a written motion and heard argument
from the prosecutor.  The court responded:

I have reviewed the People's motion as well as the addendum and I
have spent some time researching the issue and I do conclude that the
sole issue that has to be dealt with is the Court's belief in the
genuineness of the People's explanation as to whether or not it was
based on a race-neutral reason and whether or not the People were
motivated by racial bias. . . .  [A]ll 6 of the People's peremptories
have been of male Blacks. . . .  Four out of possibly five remain on the
panel.  There have been several more or there are several more
available in the prospective panel. . . .  The Court does also note . . .
the defendants are both Black as are all the victims, deceased and
otherwise.

Based on the underlying fact situation, I don't see anything that
appears to be inherently racial in the case nor do I believe there is any
obvious motive under these facts for the prosecution to specifically
exclude Blacks. . . .  The Court does state my initial ruling yesterday
was clearly not made on any finding that I disbelieved the

-15-

prosecutor's explanation.  I did not disbelieve it nor did I disbelieve the prior explanations.  The prior challenges were amply supported by the explanation given after the challenge was made by the prosecution.

As to the last challenge, the juror did seem to meet all the tests with the sole exception of that prior jury experience.  This was volunteered and not solicited.  It is, nonetheless, race neutral.  [¶]  There is nothing in the history of this case that gives me a reason to question the genuineness of the reasons given by the prosecution.  For example, there have been no other jurors who had acquitted in prior juries who have nevertheless been accepted, nor did she accept any jurors that previously voted to acquit on a murder or any other type of case.  [¶] I agree with the prosecution.  My reading of the cases concludes that is the end of my inquiry and I do believe the explanation.  At the same time, I was and am very uncomfortable with the appearance that has been presented.

With respect to my comments to the jury about the Rodney King case, a large amount of the outcry in the Rodney King case was due to the public perceptions, not necessarily reality.  There was no participation in that case by any Black jurors.  We don't have that extreme here, but I am uncomfortable with the perception left.

I am reversing my ruling yesterday and I am denying the motion for mistrial.  I wish to state for the record I am in disagreement with the People that a prima facie case has been made and every future challenge to Black jurors will be carefully scrutinized, not only by the parties here but also up the appellate ladder.  Anybody that gets a hold of this will be looking at this particular issue.  [¶]  I would like to caution the prosecution that the level of scrutiny is the same for all jurors regardless of what their color is.  [¶]  The motion is denied.

(15 RT 2230-34.)

The prosecutor later excused a seventh Black man from the jury, and the defense brought its fourth *Wheeler* motion.  The trial court denied it, stating that it "accept[ed] the prosecution's explanation and reason as valid . . . ."  (15 RT 2263.)

## C.   Decision on Direct Appeal

As noted above, on direct appeal, the California Supreme Court "assume[d] solely for purposes of argument that, for each prospective juror, [it] must proceed to the third step of the *Batson-Wheeler* inquiry, i.e., whether substantial evidence supported the trial court's finding that the prosecution had articulated a permissible, race-neutral reason for the excusal." *Lewis*, 39 Cal. 4th at 1010.  It also "assume[d], without deciding, that comparative juror analysis must be undertaken for the first time on appeal in the present case . . . ." *Id.* at 1017.

The California Supreme Court held as to prospective juror V.H.:

In light of V.H.'s vote to acquit another criminal defendant of rape, rejecting the testimony of a female victim of violence, the prosecutor had reason to be skeptical about V.H.'s willingness to be fair in this case, in which the testimony of female victims of violence would be crucial.  On this basis, she was entitled to excuse him. . . .

Defendants further urge that S.P. (who was perceived as possibly Hispanic), like V.H., had served on a jury that tried a criminal case, and yet the prosecutor did not peremptorily challenge her or attempt to learn whether her jury voted to acquit the defendant, which was a stated reason for peremptorily challenging V.H.  But the two prospective jurors were not similarly situated.  The charges in the case in which S.P. participated consisted of trespassing and assault.  She expressed a willingness to be fair and open-minded toward both parties, including the People, and was willing to follow the law, except that she would hold the prosecution to a higher standard of proof than beyond a reasonable doubt in a capital case.  On the basis of S.P.'s views on the burden of proof, the prosecutor challenged her for cause.

Although the prosecutor stated she found V.H. acceptable until she learned he voted to acquit another defendant of rape, and did not inquire about the verdict S.P.'s jury returned, nevertheless the two were not similarly situated.  As the prosecutor emphasized, V.H.'s case involved rejecting the allegations of a woman who had been the subject of a violent and felonious assault against her, whereas the case S.P. heard does not appear on this record to have been similarly

-17-

serious. . . .   The prosecutor's concern with prospective jurors who had served on rape trials extended to others.  On learning that M.J. had served on a jury trying a rape case, that the jurors disagreed on the verdict, and that the disagreement centered on the alleged victim's credibility as a witness, the prosecutor wanted to know which way M.J. had voted.  Defense counsel objected and the trial court sustained the objection.  Nevertheless, the prosecutor asked numerous questions of M.J. concerning the rape case jury on which she had previously served.  On this record, S.P. does not appear similarly situated to V.H.

*Id.* at 1014, 1023-24 (footnote included as in-line text).

### D.    Analysis:  Prospective Juror V.H.

#### 1.    Prior Jury Service

First, to the extent the record is limited about the nature of the cases on which S.P. served as a juror, that limitation does not support a conclusion that S.P. was not similarly situated to V.H.  To the contrary, "'[t]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.'"  *Green v. LaMarque*, 532 F.3d 1028, 1033 (9th Cir. 2008) (quoting *Miller-El*, 545 U.S. at 246).  The prosecutor left unknown the seriousness of the alleged assault, whether the alleged victim was a woman, and whether the victim's credibility was in question.  "That the prosecutor did not question . . . similarly situated venire member[]" S.P. about the nature of the criminal assault allegations "undermines the prosecutor's . . . asserted rationale for striking" V.H. *Id.*  The fact that the prosecutor "asked numerous questions" of Black prospective jurors V.H. and M.J. (*see* 14 RT 2168-72); *Lewis*, 39 Cal. 4th at 1024, but not "possibly Hispanic" S.P. supports, rather than refutes, Petitioner's allegations of discrimination.

Second, the information contained in the record about the cases S.P. heard makes clear that S.P. and V.H. were similarly situated.  S.P. had served as a juror not only on allegations of trespassing and assault, but also on allegations of

excessive force by the Los Angeles Police Department against a woman.  (*See* 1 CT Supp. 261 (juror questionnaire of S.P.); 12 RT 1614-15; 13 RT 1734-35.)  The trial court asked S.P. about her service in that case:

> You were involved as a juror previously in a suit against the LAPD?
>
> Prospective Juror [S.P.]:  Yes.
>
> The Court:  And the jury did reach a verdict?
>
> Prospective Juror [S.P.]:  Yes, we did.
>
> The Court:  Did that involve some kind of excessive force allegation?
>
> Prospective Juror [S.P.]:  Yes.
>
> The Court:  It did.  Did it involve credibility of police officers?
>
> Prospective Juror [S.P.]:  No, it didn't.
>
> The Court:  What did it involve?  Can you tell me just briefly?
>
> Prospective Juror [S.P.]:  *It was really credibility of the person suing.*
>
> The Court:  . . . How long ago was it?
>
> Prospective Juror [S.P.]:  Two years.

(12 RT 1614-15 (emphasis added)).  The prosecutor also questioned S.P. about her experience:

> [I]n the civil case where it was a lawsuit against LAPD, did you vote on the amount of damages?
>
> Prospective Juror [S.P.]:  No, we didn't.
>
> Ms. Clark:  And was that because you were not asked to?
>
> Prospective Juror [S.P.]:  We never got – she didn't win.
>
> Ms. Clark:  Oh, you mean the plaintiff who was suing LAPD?
>
> Prospective Juror [S.P.]:  Right.

Ms. Clark:  She lost?

Prospective Juror [S.P.]:  Right.

Ms. Clark:  In that particular case, did you find yourself attempting to evaluate whether or not she was telling the truth when she took the witness stand?

Prospective Juror [S.P.]:  No, we didn't.

Ms. Clark:  Did you find it hard to do?

Prospective Juror [S.P.]:  At first it was.  But as they brought more in, more evidence and things against her, it was a little easier.

Ms. Clark:  So when you evaluate the credibility of a witness, would it be fair to say you look not at just the witness' demeanor, but all the other witnesses to see how it fits?

Prospective Juror [S.P.]:  Right.

Ms. Clark:  Whether it's true or not.

Prospective Juror [S.P.]:  Yes.

Ms. Clark:  Do you think you could do that again?

Prospective Juror [S.P.]:  Yes.

(13 RT 1734-35.)

    In explaining why she excused V.H., the prosecutor mentioned the "situation of a criminal trial," which differed from S.P.'s civil jury service.  (14 RT 2202.)  The significance of that situation, however, was that V.H. had "reject[ed] the testimony of a female victim of violence . . . ."  *Lewis*, 39 Cal. 4th at 1014; (*see* 14 RT 2201-2203).  S.P., who had rejected the testimony of a female victim of alleged violence when a lesser, civil burden of proof applied, would be only more likely to reject it when proof beyond a reasonable doubt was required.  *Cf. Miller-El*, 545 U.S. at 247 n.6 ("None of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all

respects, and there is no reason to accept one. . . .  A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.").  Although S.P. made explicit to the prosecutor that she disbelieved the female alleged victim, the prosecutor did not strike S.P. from the jury.

### 2.   Favorability to Prosecution

In other respects, V.H. was much more favorable to the prosecution than was S.P.

On voir dire, S.P. held firm to the position that she would hold the prosecution to a higher burden of proof than proof beyond a reasonable doubt – so firm, in fact, that the prosecutor challenged S.P. for cause on that basis.  (13 RT 1742); *Lewis*, 39 Cal. 4th at 1023 n.17.  Specifically, when asked on her juror questionnaire what her general feelings about the death penalty were, S.P. replied, "I'm for the death penalty only if the person is found guilty 100%."  (1 CT Supp. 263.)  During voir dire, the trial court explained to S.P. at length that the jury has an obligation to vote guilty when the prosecution proves the charges beyond a reasonable doubt, "[e]ven though it's not a hundred percent."  (12 RT 1616-18.) Even after that explanation, when the prosecutor asked S.P., "Knowing this is a capital case, would you be satisfied with proof beyond a reasonable doubt or would you . . . require me to prove more than that?" S.P. responded, "I would say a little more."  (13 RT 1735.)  The prosecutor continued:

> And you feel that way because it is a death penalty case and you would be voting on the issue of penalty?
>
> Prospective Juror [S.P.]:  Yes.
>
> Ms. Clark:  And even if the judge instructed you that you had to abide by the proof beyond a reasonable doubt, and I don't have a burden any greater than that, you personally would want me to satisfy that higher standard of proof greater than beyond a reasonable doubt?

Prospective Juror [S.P.]:  Right.

(*Id.*)  When her challenge for cause was not granted,[2] the prosecutor did not exercise a peremptory challenge against S.P., however.  S.P. proceeded to serve as a juror.  The prosecutor had peremptory challenges remaining when the parties accepted the jury.  (15 RT 2270; *see also* 28 U.S.C. § 2254(d) Briefing, Docket No. 92, at 45.)

Juror V.H. had no issue with the standard of proof beyond a reasonable doubt.  He wrote on his juror questionnaire that his "general feelings about the death penalty is, that the right person or persons are on trial for the crime," because "you want the right person or persons to stand trial, not the wrong person."  (5 CT Supp. 1406.)  He said his "opinion on the death penalty has always been to be proven guilty or not guilty," and that his feelings about the death penalty were strong "because you do not want to convict a person that's not guilty."  (*Id.*)  On voir dire, the trial judge said to V.H., "You indicate your feelings about the death penalty – you write you have no trouble as long as you are convinced of guilt. . . . You cannot convict anybody unless you are convinced beyond a reasonable doubt. If you have a doubt that's based on reason, you . . . vote not guilty."  (14 RT 2192-93.)  V.H. said he understood, and the trial judge asked:

Is that standard sufficient for you?

Prospective Juror [V.H.]:  Yes.

The Court:  If you were convinced beyond a reasonable doubt, would you want something more than that because of this type of case?  I

---

[2] It does not appear from the record that the court ruled on the challenge for cause or that the prosecutor brought her challenge to the court's attention at any later point.  (*Cf.* 13 RT 1798 (prosecutor's statement to jurors during voir dire after her challenge to S.P., "I'm going to call witnesses.  They may call witnesses for the defendant and you may have to decide who you believe. . . . [S.P.] had the opportunity to do that.  Some of the other jurors talked about that.").)

don't know if that question makes sense.

Prospective Juror [V.H.]:  You asked me if I wanted more?

The Court:  Right.

Prospective Juror [V.H.]:  Than what they presented?

The Court:  Right.  Not that they presented.  If what they presented was enough to convince you beyond a reasonable doubt –

Prospective Juror [V.H.]:  Right.

The Court:  – would that be enough for you to make a decision in this case?

Prospective Juror [V.H.]:  Yes.

The Court:  Both in the first trial –

Prospective Juror [V.H.]:  I would like to hear all the evidence.

The Court:  Once you heard all that and you were convinced beyond a reasonable doubt, would you have any problem voting for guilt knowing that you may eventually have to deal with the punishment?

Prospective Juror [V.H.]:  No.

The Court:  Okay.  As to the punishment side, once you are convinced – obviously, we never get there unless you are convinced.  If you are not convinced, we will not have a penalty trial, okay?

Prospective Juror [V.H.]:  Right.

The Court:  Does that – is that something that makes you a little bit more comfortable about this job or not?

Prospective Juror [V.H.]:  I'm comfortable with it.

(14 RT 2193-94; *see also* 14 RT 2198-99 (prosecutor's questioning of V.H. confirming his comfort with the standard of proof beyond a reasonable doubt).)

Even beyond that issue, S.P.'s views were less favorable to the prosecution than were V.H.'s.  V.H., who had served in the military and been in combat in

South Vietnam (5 CT Supp. 1401), held more favorable views on the death penalty. He agreed somewhat that anyone who intentionally kills another person should always get the death penalty, adding only, "A person can[]not just say death to another person until you give them a trial to prove guilty or not guilty." (5 CT Supp. 1410.) He "strongly" disagreed that anyone who intentionally kills another person should never get the death penalty, explaining, "I believe certain crimes deserve the death penalty." (*Id.*) S.P.'s views on the death penalty were more moderated. She wrote that her feelings about the death penalty were not strong and that "[i]t depends upon the circumstances." (1 CT Supp. 264.) S.P. disagreed only "somewhat" that anyone who intentionally kills another person should never get the death penalty, explaining, "I'd have to hear the evidence." (1 CT Supp. 268.) Like V.H., S.P. agreed somewhat that anyone who intentionally kills another person should always get the death penalty, but "depend[ing] on the circumstances of the case." (*Id.*)

In addition, S.P. wrote that she, her close friends, and her relatives had never had an unpleasant or a pleasant experience with a peace officer. (1 CT Supp. 269.) V.H.'s experiences with law enforcement, even though more extensive, were explicitly positive. V.H. wrote that he, his close friends, and relatives had never had an unpleasant experience with a peace officer but had had a pleasant experience with a peace officer. (5 CT Supp. 1411.) V.H. explained, "I've always thought of peace officers as being a help to the community." (*Id.*) When asked how he felt about the response of law enforcement in his experience with the criminal justice system, he wrote, "I feel, they do the best job they can." (5 CT Supp. 1402.)

As the California Supreme Court noted, "V.H.'s son had had trouble with the law at least since age 15 and was currently incarcerated. Despite this, neither was bitter toward the state, and V.H. had encouraged his son to do his time without complaining." *Lewis*, 39 Cal. 4th at 1014. Specifically, the trial court asked V.H.,

"How do you feel about the way the system has handled your son?  Do you have any specific feelings about it?  Do you think he was treated fairly or unfairly?"  (14 RT 2192.)  V.H. responded, "My concern mostly was with how he felt about the situation, and he explained to me that he was not bitter because he made the mistakes.  So I was comfortable with that, and I tried to encourage him to do his time and not be bitter."  (*Id.*)  The trial judge confirmed with V.H. that that "seem[ed] to be the way it's working" and that "he's not bitter."  (*Id.*)  V.H. had visited his son in prison in Huntingdon, Pennsylvania.  (5 CT Supp. 1402.)  On his questionnaire, when asked how he felt about what happened when his son was tried for "stealing" in 1989, approximately four years prior to V.H.'s completion of the juror questionnaire, V.H. wrote, "I feel my son was wrong and must pay for his crime."  (5 CT Supp. 1402; *see also* 14 RT 2191 (clarifying on voir dire that to his knowledge his son did not go through a jury trial).)

### 3.    Conclusion

"When the government's choice of jurors is tainted with racial bias, that 'overt wrong casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial.'"  *Miller-El*, 545 U.S. at 238 (quoting *Powers v. Ohio*, 499 U.S. 400, 412 (1991); internal alterations omitted). After reviewing the record and the comparative juror analysis, the only finding supported by the record is that the prosecutor's excusal of V.H. was "motivated in substantial part by discriminatory intent."  *Foster*, 136 S. Ct. at 1754 (internal quotation and footnote omitted).  Petitioner has shown that the California Supreme Court made an unreasonable determination of the facts under § 2254(d)(2) in denying his *Batson* claim and has shown clear and convincing evidence to rebut the presumption of correctness under § 2254(e)(1).

Because "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose," habeas relief is granted as to Claim 1.  *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994) (quoted with approval in

*Snyder*, 552 U.S. at 478).  The Court need not, and does not, reach Petitioner's *Batson* claim as to other prospective jurors.  *See Snyder*, 552 U.S. at 478 ("Because we find that the trial court committed clear error in overruling petitioner's *Batson* objection with respect to [one prospective juror], we have no need to consider petitioner's claim regarding [another].").

## III.    Claim 3:  Sufficiency of the Evidence

In Claim 3, Petitioner alleges that the evidence presented at trial was insufficient to sustain his first degree murder and attempted murder convictions. (Pet. at 100-01.)  "Since . . . the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient, the only just remedy available for that court is the direction of a judgment of acquittal."  *Burks v. United States*, 437 U.S. 1, 18 (1978) (internal quotation omitted); *see also United States v. Hodges*, 770 F.2d 1475, 1477 (9th Cir. 1985) ("[T]he existence of other grounds for reversal does not relieve an appellate court of the need to first review the sufficiency of the evidence.").  Thus, Claim 3 seeks greater relief than that granted on Claim 1.

Evidence is sufficient to support a conviction:

whenever, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).  And a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable.

*Parker v. Matthews*, 567 U.S. 37, 43 (2012) (internal quotation omitted; internal citation edited; emphasis in original); *see also Ngo v. Giurbino*, 651 F.3d 1112, 1115 (9th Cir. 2011) ("[A]fter AEDPA, we apply the standards of *Jackson* with an additional layer of deference to state court findings." (internal quotation omitted)).

The court must:

> review the evidence in the light most favorable to the prosecution. Expressed more fully, this means a reviewing court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

*McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (internal quotations omitted).  The reviewing court "look[s] at the elements of the offense under state law." *Emery v. Clark*, 643 F.3d 1210, 1214 (9th Cir. 2011) (citing *Jackson*, 443 U.S. at 324 n.16).

Under California law, "[f]irst degree murder . . . is the unlawful killing of a human being with malice aforethought, . . . [with] the additional elements of willfulness, premeditation, and deliberation . . . ." *People v. Chiu*, 59 Cal. 4th 155, 166 (2014), *superceded by statute on other grounds as stated in People v. Lopez*, 38 Cal. App. 5th 1087, 1103 (Cal. Ct. App.), *review granted*, No. S258175, 2019 WL 5997422 (Cal. 2019); *see also People v. Knoller*, 41 Cal. 4th 139, 151 (2007). "[A]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." *People v. Smith*, 37 Cal. 4th 733, 739 (2005) (internal quotation omitted).

Petitioner alleges that the evidence is insufficient to support his convictions because:  (a) Petitioner's palm print on the gun used in the murders was not in a position from which he could have fired, was one of two palm prints from different people (one of whom was not Petitioner or his codefendant), and was not necessarily placed there on the day of the murders; (b) Petitioner did not match the description of the shooter given by eyewitnesses; (c) the prosecution's explanation of the reasoning behind the shootings was speculative; and (d) the jury violated the court's instruction that if there were two reasonable interpretations of circumstantial evidence, it must accept the interpretation pointing to innocence. (Pet. at 100-01; Petitioner's Opposition to Respondent's 28 U.S.C. § 2254(d)

Briefing, Docket No. 101 ("Opp."), at 79-85.)  Petitioner argues that the eyewitness identifications were inconsistent because one witness, who testified that he had a good view of the shooter's face, did not see any facial hair around the shooter's lips (18 RT 2810, 2826), unlike Petitioner's goatee and mustache at the time (18 RT 2826; 23 RT 3772), and because Petitioner was between 1 and 3 inches taller and between 22 and 37 pounds heavier than the witnesses' estimates. (Opp. at 82-83 (citing 18 RT 2886, 2899-2902, 2912-13, 2916; 23 RT 3777; 24 RT 3872).)

The California Supreme Court rejected the claim on direct appeal, holding:

The evidence refutes Oliver's claim of mistaken identity, and shows that he committed the capital crime.  Oliver became enraged at [Lewis's estranged wife, Cynthia] Mizell when she had the police forcibly extract him from Lewis's house the day she ended her relationship with Lewis and moved out.  The jury could reasonably infer that Oliver, out of loyalty to his brother Lewis, would be willing to help Lewis pursue his own vendetta against Mizell and her family after she left.

Of course, the hoods and masks worn by the two men who committed the capital crime at the Mount Olive Church prevented facial identification.  However, witness descriptions of the killer's height, weight, and complexion matched Oliver's general appearance.  In targeting Mizell and her immediate family for death inside the church (under the mistaken belief they would all be present, including Mizell), Oliver apparently entered and pulled the trigger (as opposed to Lewis), because parishioners were less likely to recognize Oliver (whom they did not know) than Lewis (whom they did know).  Oliver had the opportunity in advance to study Mizell's photo album and learn the faces of the family members who were intended as victims.

Two days after the capital crime, Oliver threatened [his neighbor, Louise] Holt with his Savage shotgun, which the police seized from his car.  Forensic evidence conclusively linked Oliver's shotgun to the murders and attempted murder.  Oliver's palm print impressions were found on the shotgun.  Three shells fired by the same weapon were retrieved from inside the church where the three shootings occurred.

-28-

The police found a black jacket in Oliver's car similar to clothing that the killer wore. They also found gunshot residue on the jacket. A search of the house Oliver shared with Lewis uncovered fingerless gloves similar to the pair the killer wore while wielding the shotgun inside the church. In light of the foregoing, ample evidence supported the verdicts against Oliver of murder and attempted murder, and the related multiple-murder special circumstance finding.

*Lewis*, 39 Cal. 4th at 1044-45 (footnote omitted).

First, particularly in light of the deference due to the state court's decision, the discrepancies between the witnesses' descriptions of the shooter and Petitioner's facial hair, height, and weight do not show insufficiency of the evidence supporting his convictions. *See United States v. Ginn*, 87 F.3d 367, 369 (9th Cir. 1996) ("The evidence is not rendered insufficient simply because there are discrepancies in the eyewitnesses' descriptions of the robber. [Defendant] was able to cross-examine the eyewitnesses and to argue to the trier of fact that the discrepancies . . . made those identifications unreliable. The trier of fact then had the responsibility of determining whether the identifications were credible. The discrepancies . . . are not so significant that we . . . can say the identifications were incredible." (internal citation omitted)).

Second, as Respondent argues, motive is not an element of first degree murder (Reply to Petitioner's Opposition to Respondent's 28 U.S.C. § 2254(d) Briefing, Docket No. 111, at 6) or of attempted murder under California law. *Smith*, 37 Cal. 4th at 740 ("[W]ith few exceptions, motive itself is not an element of a criminal offense. . . . The crimes of murder and attempted murder are no exception."); *People v. Virgil*, 51 Cal. 4th 1210, 1260 (2011). Reviewing the evidence in light of the elements of the offenses, Petitioner's argument that the prosecution's account was speculative does not demonstrate that no rational trier of fact could have found the elements of the crimes beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319.

-29-

The California Supreme Court did not unreasonably apply federal law or unreasonably determine the facts in holding that the evidence, including Petitioner's possession of the shotgun used in the shootings, the discovery in his home of fingerless gloves similar to the shooter's, and his possession of clothing similar to that of the shooter's with gunshot residue, was sufficient to support Petitioner's convictions.  Claim 3 is DENIED.

## IV.  Remaining Claims

Because Petitioner is entitled to relief on Claim 1, a determination of the remaining claims (beyond Claim 3) is unnecessary.  "Even if petitioner prevailed on one or more of his other claims, he could obtain no greater relief than that to which he already is entitled."  *Buckley v. Terhune*, 266 F. Supp. 2d 1124, 1144 (C.D. Cal. 2002), *aff'd*, 441 F.3d 688 (9th Cir. 2006) (en banc).  Ruling on Claims 1 and 3 without deciding Petitioner's other claims does not risk a "grave injustice." *Robbins v. Smith*, 152 F.3d 1062, 1068-69 (9th Cir. 1997) ("Resolving other issues while leaving challenges to the underlying conviction unresolved potentially can cause grave injustice to defendants . . . who, despite alleging constitutional shortcomings in the trial process, must await resolution of a renewed appeal while potentially deserving a retrial and possibly an acquittal."), *rev'd on other grounds*, 528 U.S. 259 (2000).  Rather:

> the grant of a habeas petition because of the constitutional invalidity of a conviction raises concerns that a possibly innocent person has been unjustifiably incarcerated on death row for a number of years. Delaying retrial in such cases, while attorneys fight over a sentence that may no longer exist, risks the perpetuation of a monumental injustice, should retrial ultimately result in an acquittal.

*Blazak v. Ricketts*, 971 F.2d 1408, 1414 n.7 (9th Cir. 1992) (per curiam).

Because there is no just reason for delay, the Court directs entry of a final judgment.  *See* Fed. R. Civ. Proc. 54(b) ("When an action presents more than one claim for relief . . . the court may direct entry of a final judgment as to one or more,

but fewer than all, claims . . . if the court expressly determines that there is no just reason for delay.").

## V.    Order

Claim 1 of the Petition for Writ of Habeas Corpus is GRANTED.  Claim 3 is DENIED.  All other claims in the Petition are DISMISSED AS MOOT.  Because there is no just reason for delay, the Court directs entry of a final judgment pursuant to Federal Rule of Civil Procedure 54(b).

The judgment of conviction as to defendant Anthony Cedric Oliver in the matter of *People v. Anthony Cedric Oliver*, Case No. BA001542 of the California Superior Court of Los Angeles County, shall be VACATED.  The State of California shall, within 120 days, either release Petitioner or grant Petitioner a new trial.

Within 135 days of the date of this Order, the State of California shall file in this Court a Notice of Compliance reporting the manner in which the State has complied with this Order.

**IT IS SO ORDERED.**

Dated: November 25, 2019.

_____
OTIS D. WRIGHT, II
United States District Judge